CEMENT GUN CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5302.    Promulgated September 1, 1927.

1. Taxpayer in 1914 acquired patent licenses in consideration for promises to pay royalties. Later taxpayer issued additional stock said to be in consideration for the same licenses. *Held*, no deduction for exhaustion of said licenses since no cost was established.

2. Commissioner disallowed such deduction for 1919 an. partially for 1920, and claimed by amended answer an increased deficiency for 1920. *Held*, under the Revenue Act of 1926, section 274 (e), that the deficiency should be increased.

*Chester A. Gwinn, Esq.*, for the petitioner.
*George G. Witter, Esq.*, for the respondent.

Deficiencies in income and profits taxes of $327.99 for 1919, and $4,949.94 for 1920. Petitioner claims a deduction for exhaustion of rights under a license agreement.

### FINDINGS OF FACT.

The petitioner is a New York corporation, with its principal place of business at Allentown, Pa. It is the licensee of certain patents under the following agreement:

GENERAL CEMENT PRODUCTS COMPANY

LICENSE AGREEMENT

TO

CEMENT GUN COMPANY, INC.

THIS AGREEMENT made this 1st day of January, 1914, by and between the GENERAL CEMENT PRODUCTS COMPANY (hereinafter called the "Licensor"), a New York Corporation, and CEMENT GUN COMPANY, INC. (hereinafter called the "Licensee"), a New York Corporation, WITNESSETH:

WHEREAS, the Licensor is the owner by mesne assignments of the full and exclusive right, title and interest in and to certain inventions and improvements, and the United States patents therefor, the same being a process of producing and depositing plastic or adhesive mixtures, patented February 14th, 1911, No. 984,254, hereinafter called the "Cement Gun Process", and an apparatus for mixing and applying plastic or adhesive materials, patented May 9th, 1911, No. 991,814, hereinafter called the "Cement Gun"; and

WHEREAS, the Licensor has retained to itself and is the owner of the full and exclusive right, title and interest under said patents or said inventions, except as hereinafter mentioned, in that portion of the United States and its possessions hereinafter particularly described, as to which and in which the Licensor desired to grant the rights to the Licensee herein set forth:

NOW THEREFORE, in consideration of the premises and One Dollar to each in hand paid, the receipt whereof is hereby acknowledged, and of the mutual covenants and agreements herein contained, the parties hereto have covenanted and agreed as follows:

I. The Licensor hereby grants under said patents to the Licensee the full and exclusive right to manufacture, use, sell and license others to manufacture, use and sell the said Cement Gun Process and said Cement Gun upon the terms, conditions and limitations hereinafter set forth in the following territory, to wit:

The States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, Maryland, District of · Columbia, Virginia, North Carolina, South Carolina, Georgia,

Florida, Alabama, Mississippi, Tennessee, Kentucky, West Virginia, Louisiana. Texas, Arkansas, Oklahoma, New Mexico, Arizona, Utah, Colorado, Kansas, Nebraska, Idaho, Montana, Wyoming, North Dakota, South Dakota;

Minnesota, excepting the Counties of Fairibault, Blue Earth, Nicolet, Leseur, Rice and Goodhue, and that part of said State southeast of said counties;

Iowa, excepting that part thereof lying east of the western boundary lines of Kossuth, Humbolt, Webster, Boone, Dallas, Madison, Clark and Decatur Counties;

Missouri, excepting the Counties of Marion, Shelby, Macon, Linn, Livingston, Grundy and Mercer and the territory northeast of the same;

Illinois, excepting that part thereof lying north of the southern boundary line of Madison, Clinton, Marion, Clay, Richmond and Lawrence Counties (not including, however, in said exception DuPage County) ;

Ohio, excepting the Counties of Hamilton and Cuyahoga;

Alaska; the Philippine Islands, Porto Rico and the other Insular possessions of the United States, excepting only the Hawaiian Islands;

Also upon all property of the United States Government wheresoever situated, and also upon all property of all steam railroads, throughout the entire United States and its possessions, excepting in the States of California, Oregon, Washington and Nevada and the Hawaiian Islands.

It being understood however, that a certain number of these Guns have heretofore been sold or licensed for use not exceeding one hundred Guns, however, in the above described territory.'

II. This license and all rights hereunder shall vest and remain in the Licensee during the full term of the life of such patents and of any renewals thereof, unless the Licensee shall cease to maintain its corporate existence as a solvent entity and commercial going concern, in which event, or in the event that a trustee or receiver shall be appointed and the Company shall not cause him to be discharged within six months thereafter, all rights hereunder granted to the Licensee shall then cease and determine, provided written notice to that effect be given by the Licensor to the Licensee, anything herein contained to the contrary notwithstanding.

III. This license shall be deemed to cover and include the right to manufacture, lease, use and sell the Cement Gun Process and the Cement Gun and all improvements and inventions relating thereto and inventions of a similar character that may be used in connection therewith, which may be now or hereafter owned or controlled by the Licensor. Should the Licensee acquire or have the right to acquire any improvements in the Cement Gun Process or the Cement Gun, which improvements shall also be covered by the claims of the patents aforesaid, during the term of this agreement, it shall forthwith make discovery thereof to the Licensor and the Licensor shall have the right to acquire the same upon reimbursing to the Licensee the cost to it if it shall have acquired said right, or upon payment of the amount necessary to acquire said right; it being understood that the Licensor shall pay all expenses involved in obtaining the letters patent covering said invention.

If the Licensor shall not acquire said rights within thirty days after notice to it, then the Licensee shall have the right to retain if it has acquired or to acquire the same and retain the ownership therein.

IV. The Licensee admits the validity of the aforesaid patents covering the Cement Gun and the Cement Gun Process, and agrees that it will not, directly or indirectly, while this agreement remains in force, question or deny the validity or scope of said patents or the title of the Licensor therein. In the event of the Process patents being sued upon for infringement, and of the entry of a final decree in the Court of highest jurisdiction into which the question of the

validity of said patent may be taken, which decree shall deny the validity of said patents, or any of them then the Licensee may, by notice in writing to the Licensor, forthwith cancel and terminate this agreement, but all apparatus manufactured or sold by the Licensee under patents owned or controlled by the Licensor up to that time shall remain forever licensed under said patents.

V. Should for any reason any of the rights heretofore granted under said patents to any other Licensee or Licensees lapse or revert to the Licensor, the territory to which the same relates may at the option of the Licensee be included with that to which this license relates and included within the term hereof.

VI. The Licensor reserves to itself as royalty, and the Licensee will pay to the Licensor, ten per cent (10%) of the gross amount received for the sale of each Cement Gun hereafter sold by the Licensee or sold by its consent or by its sub-licensee, during the life of this contract. Cement Guns sold in combination with other machines or accessories shall be deemed to have been sold at a sum equal to the average price for Cement Guns during the preceding calendar year, save for the first year it shall be the average price for that year.

VII. Royalties shall apply to the sale of the Cement Gun, with fifty feet of rubber material hose and fifty feet of rubber water hose included, but shall not apply to compressors or repair parts or supplies. The Cement Gun shall be deemed to be the mechanism depicted in the annexed cut or its equivalent.

VIII. The Licensee will keep accurate and correct account of Cement Guns sold and will on the 10th day of each month render a statement of such sales and the payments received thereon and make payment of the royalties, based upon the amount received by it or by its sub-licensees, for the calendar month preceding.

IX. The Licensee shall have the right in the name of the Licensor to defend and institute all legal proceedings deemed necessary by it to protect itself in the rights herein granted, or to establish or defend the legality of such patents, and the Licensor hereby agrees to cooperate in all such legal proceedings, and grants full power of attorney to the Licensee to perform all such acts as may be necessary in carrying on such legal proceedings, the expense involved in such proceedings to be paid by the Licensee, who may from time to time, however, deduct one-half of such expense from the royalties due, or to become due, to the Licensor. The Licensor shall, so far as to it known, keep the Licensee informed of any claim of infringement of or of prospective litigation affecting the validity of said patents.

X. The Licensee may at any time after February 14, 1928, elect to terminate this agreement, or may continue it till such later times as it may see fit.

XI. The Licensee will not elect to revoke this agreement prior to the expiration of the process patent because of any judicial decree determining the invalidity of the same, provided it shall still continue to use apparatus covered by any of the other of said patents which have not been held invalid.

XII. The Licensee will permanently mark in the castings of the Gun in such manner as to indicate plainly where, when, and by whom said Gun was manufactured, it being the intent and purpose of this agreement that all Guns hereafter manufactured shall be permanently marked in such manner as to be readily identified.

XIII. It is the intention hereby to convey to the Licensee all rights to manufacture, lease, use, and sell Cement Guns, and Cement Gun Process in all United States territory not heretofore granted to the Pacific Cement Gun Co., Los Angeles Cement Gun Company, General Cement Gun Company, Cincinnati Cement Gun Company and the Parsons Stoker Company and Alexander & Baldwin, Limited.

IN WITNESS WHEREOF, the respective parties hereto have caused this instrument to be duly executed the day and year first above written.

GENERAL CEMENT PRODUCTS COMPANY,<br>
By Robt. L. McElroy,<br>
President.

ATTEST:
    A. M. Crooker,
        Secretary
(Corporate Seal)

CEMENT GUN COMPANY, INC.,<br>
By Edward T. Magoffin,<br>
President.

ATTEST:
    K. A. Fox,
        Secretary
(Corporate Seal)
APPROVED:

Robert L. McElroy<br>
John E. Shepherd

The original of this contract has written on the back thereof a memorandum dated August 13, 1914. This memorandum was not introduced in evidence, and the substance thereof was not shown.

Patent No. 984,254, issued February 14, 1911, covers a process of applying plastic or adhesive materials to surfaces. This process is known as the cement-gun process. Patent No. 991,814, issued May 9, 1911, covers an apparatus for mixing and applying plastic and adhesive materials. This apparatus is known as the cement gun. The principle utilized in the process and apparatus is the transportation and application of materials by compressed air and the hydration of such materials in the process of application. Apparently they are used principally in the making and application of concrete. Concrete made and applied by this process and apparatus is superior in many respects to concrete produced otherwise.

The process and apparatus were invented by Carl E. Akeley, who assigned his rights therein to the McElroy-Shepherd Co., a New York corporation, to whom these patents were issued. The McElroy-Shepherd Co., and John E. Shepherd and one McElroy, the organizers and principal stockholders of the company, during a period of approximately four years expended over $60,000 in the development and perfection of these inventions. In addition, such services as were rendered by Akeley, McElroy and Shepherd were rendered without cost.

Shortly after the issuance of the letters patent, McElroy and Shepherd formed a corporation, known as the General Cement Products Co., for the purpose of separating their interests in these patents from other interests. To this company the McElroy-Shepherd Co. gave an exclusive license for the manufacture, sale and use of cement guns and the right to license others so to do. This license covered

the entire territory of the United States except for the rights to some restricted areas theretofore granted by the McElroy-Shepherd Co., which covered the sale and use but not the manufacture of cement guns.

The General Cement Products Co. licensed the companies set forth below to sell and use the cement gun in the territory indicated. The consideration received for the license is indicated in each case where such consideration was shown in the evidence.

The New York Cement Gun Co. was given a license for New York City and the surrounding territory. For this license the General Cement Products Co. received 51 per cent of the capital stock of the New York Cement Gun Co., and the subscribers to the remaining stock were to furnish $100,000 working capital.

The Eastern Cement Gun Co. was given a license for the State of Pennsylvania, most of New Jersey, Delaware, and Maryland. For this it paid to the petitioner one-half its capital of $1,000,000 common stock and $500,000 preferred stock, $90,000 in first mortgage bonds and $10,000 cash. The subscribers for the remaining stock paid in $100,000 working capital.

The General Cement Gun Co. had a license for Illinois, Indiana, part of Wisconsin, part of Minnesota, part of Missouri, and part of Iowa. For this it paid $50,000 cash and one-half of its capital stock. The remaining subscribers agreed to furnish $100,000 capital.

The Pacific Cement Gun Co. was given a license for the entire State of California, with the exception of Los Angeles County. For this it paid 51 per cent of its capital stock of $500,000. It had a working capital of $150,000.

The Cincinnati Cement Gun Co. was given a license for Hamilton County, Ohio. For this it paid $50,000 in cash and 51 per cent of its capital stock of $10,000. The remaining stockholders furnished working capital of $5,000.

The New England Cement Gun Co. was given a license for the New England States. For this it paid 51 per cent of its capital stock and the remaining stockholders were responsible for $50,000 working capital.

The rights for the Hawaiian Islands were sold for $25,000, and in addition thereto the purchasers agreed to buy cement guns at a stipulated price.

Licenses were also given to the South Jersey Cement Gun Co. and the Los Angeles Cement Gun Co. The territories covered and the considerations paid are not shown.

These licenses covered only the right to use and sell cement guns, and did not cover the right to manufacture the guns, with the possible exception of the license issued to the General Cement Gun Co., as to

108346° —28——79

which the evidence is not clear.  No royalties were reserved in these licenses, but it was agreed that in furnishing machines to these companies the General Cement Products Co. should have a definite percentage of profit on the sales price.

The Canadian rights were sold for $50,000 and a one-third interest in a corporation with a captial stock of $1,000,000.  The Russian rights were sold for $60,000.  It is not shown whether these rights included the right to manufacture, sell and use, or only the right to sell and use, nor is it shown whether the rights were sold by the McElroy-Shepherd Co. or the General Cement Products Co.

The petitioner was incorporated in December, 1913.  In 1914 the General Cement Products Co. entered into the contract with the petitioner which is set forth above.  For the purposes of making this arrangement with the petitioner, the General Cement Products Co. reacquired some of the rights it had previously sold to others.

The petitioner was a fully organized and going concern from the date of the license, January 1, 1914.  It sold guns from the time of its incorporation.  The following are the minutes of a special meeting of the stockholders of the petitioner held on August 14, 1914:

Minutes of a special meeting of the stockholders of the Cement Gun Company, Inc., held at Room 110, 27 Pine Street, New York City, on the 14th day of August, 1914, at 11 : 00 A. M.

The meeting was called to order by Mr. Edward T. Magoffin.

Upon motion, Mr. Magoffin was made Chairman of the meeting, and K. A. Fox was elected Secretary.

Upon call of a roll of the stockholders of record, the following were found to be present in person :—

| | |
|---|---|
| Arthur J. Baldwin | 98 shares |
| Edward T. Magoffin | 1 share |
| K. A. Fox | 1 share |

representing all of the stock issued and outstanding.

Proof that the meeting was called upon notice such as is required for the annual meeting of the corporation, to wit, a waiver of notice of the meeting and of the publication thereof and of the lapse of time by all of the stockholders, was read and placed on file.

The following motion was duly made and seconded and a vote taken thereon :—

RESOLVED that the capital stock of the Cement Gun Company, Inc., be increased from the present amount thereof, to wit, $100,000, consisting of 1,000 shares of the par value of $100 each, to $500,000, to consist of 5,000 shares of the par value of $100 each.

The resolution was duly adopted by the affirmative vote of the holders of more than a majority of the stock of the company, 100 shares voting in its favor, and no shares voting against its adoption.

Upon motion duly made and seconded, a vote was then taken on the following preamble and resolution :—

WHEREAS, the stockholders of this corporation have duly authorized an increase of the capital stock of the company from $100,000 to $500,000, to consist of 5,000 shares of the par value of $100 each ; and

WHEREAS, the present authorized capital stock of the corporation consists wholly of one class of stock, and it has been found desirable to classify the new stock into common and preferred,

Now, THEREFORE, BE IT RESOLVED that the said authorized increase of capital stock, amounting to $400,000, be classified so that $300,000 thereof, consisting of 3,000 shares of the par value of $100 each, shall be common stock, and $100,000 thereof, consisting of 1,000 shares of the par value of $100 each, shall be preferred stock, and that the said preferred stock shall be entitled to preference and priority over the common stock in manner following:—

The holders of the preferred stock shall be entitled to receive, and the corporation shall be bound to pay, a fixed cumulative dividend at the rate of but not exceeding six per cent. per annum before any dividends shall be set apart or paid in excess thereof. The preferred stockholders shall also be entitled to a preference in the assets on the dissolution of the company;

RESOLVED FURTHER that the President and the Secretary of the Company and the Chairman or President and the Secretary of this meeting be and they hereby are authorized and directed to make, execute, and file proper certificates of the proceedings of this meeting in the offices respectively of the Secretary of State of New York and the Clerk of Orleans County, and to do all acts and things that may be necessary to comply with the provisions of law applicable to and regulating the increase in stock of the company and the issuing of common and preferred stock.

The votes of stockholders owning 100 shares of stock of the corporation, out of a total of 100 shares issued and outstanding, having been cast in favor of said resolution, and none against the same, the same was declared duly adopted.

There being no further business, the meeting adjourned.

(Signed)　　　　K. A. Fox
　　　　　　　　　　Secretary

The following are the minutes of a special meeting of the board of directors of the petitioner held on August 18, 1914:

Minutes of a special meeting of the Board of Directors of the Cement Gun Company, Inc., held at Room 110, 27 Pine Street, New York City, on the 18th day of August, 1914, at 11.00 A. M.

There were present Edward T. Magoffin, K. A. Fox, and Elmer E. Wigg, being a majority of the Board.

A waiver of notice of the meeting, signed by all of the directors, was presented and ordered filed.

The President reported that a certificate authorizing the increase of the capital stock of the Company from $100,000 to $500,000 and classifying the stock of the Company into $100,000 of six per cent. cumulative preferred stock and $400,000 of common stock had been filed in the office of the Secretary of State of New York; that a duplicate of such certificate had been forwarded to the Clerk of Orleans County for filing; and that the organization tax upon the increase of capital stock had been paid.

The President submitted the following proposition from Leonard D. Baldwin to the Company:—

"NEW YORK, *August 18, 1914*.

" To the CEMENT GUN COMPANY, INC.

" GENTLEMEN :—

" I hereby make you the following proposition :—

"(1) I hereby offer to transfer and convey or cause to be transferred and conveyed to your Company all of the net assets of the New York Cement Gun Company, a New York corporation, including all of its rights of every kind;

"(2) I agree to have issued to your Company a license from the General Cement Products Company, a New York corporation, in the form submitted herewith.

" For and in consideration of said property you are to :—

"(a) Pay me $10,000 in cash and $20,000 in notes with interest, $10,000 of such notes payable on August 15, 1915, and $10,000 on August 15, 1916;

"(b) Issue to me or my nominees $390,000 (par value) of the common stock of your Company and $50,000 (par value) of the six per cent. cumulative preferred stock of your Company, such stock to be fully paid and non-assessable.

" Said stock, notes, and cash shall be delivered to me upon proper transfers to your Company of the aforementioned property being made.

          · Very truly yours,

                              (Sgd.)          LEONARD D. BALDWIN."

After discussion, the following resolution was unanimously adopted :—

WHEREAS, Leonard D. Baldwin has offered to convey or cause to be conveyed to this Company all of the assets of every kind and nature of the New York Cement Gun Company and to cause to be issued to this Company a license from the General Cement Products Company in the form submitted to this meeting, a copy of which license is annexed to the minutes of this meeting, and to accept in payment therefor $10,000 in cash and $20,000 in notes with interest and $390,000 (par value) of the common stock of this Company and $50,000 (par value) of the preferred stock of this Company, all of which is more fully set forth in the said proposition of Leonard D. Baldwin ; and

WHEREAS, the directors of this Company have examined into the aforementioned property, and the same is necessary for the business of this Company and to carry out its contemplated objects,

NOW, THEREFORE, BE IT RESOLVED that the Company accept the offer of Leonard D. Baldwin and purchase the aforesaid property that the same be adjudged and declared to be of the reasonable value of $470,000; and that the Company issue in payment therefor to the said Leonard D. Baldwin or his nominees $390,000 (par value) of the fully paid and non-assessable common stock of this Company and $50,000 (par value) of the fully paid and non-assessable six per cent. cumulative preferred stock of this Company, and pay to him in cash the sum of $10,000, and make, execute and deliver to him two promissory notes for $10,000 each, with interest, dated August 15, 1914, one payable August 15, 1915, and the other August 15, 1916, said stock, notes, and cash to be issued and delivered by the officers of the Company upon receiving proper transfers of the said property.

The President presented a license agreement with the General Cement Products Company in the form submitted with the proposition of Mr. Leonard D. Baldwin.

The following resolution was unanimously adopted :

RESOLVED that the officers of the Company be and hereby are authorized to execute and deliver on behalf of the Company the said license agreement.

The resignation of Mr. J. W. Baldwin as a director of the Company was received and on motion was accepted. Mr. Leonard D. Baldwin was unanimously elected a director of the Company to fill the vacancy caused by the resignation of Mr. J. W. Baldwin.

The resignation of K. A. Fox as Treasurer of the Company was presented and on motion was accepted. Mr. Leonard D. Baldwin was unanimously elected Treasurer of the Company to fill the vacancy caused by the resignation of K. A. Fox.

There being no further business the meeting adjourned.

                              (Signed)          K. A. Fox, Secretary.

There are appended to the above minutes of the meeting of the board of directors the offer from Leonard D. Baldwin set forth in the minutes, and a copy of the contract of January 1, 1914, set forth above.

Leonard D. Baldwin and Arthur J. Baldwin are brothers.

The petitioner sold to the Pittsburgh Plate Glass Co. the right to use the cement gun process in the manufacture of glass. For this the Pittsburgh Plate Glass Co. paid $4,000 and purchased a number of cement guns.

Under date of April 15, 1916, the following agreement was made between Samuel W. Traylor and Leonard D. Baldwin and Arthur J. Baldwin:

MEMORANDUM OF AN AGREEMENT made by LEONARD D. BALDWIN and ARTHUR J. BALDWIN with SAMUEL W. TRAYLOR, WITNESSETH:

THAT WHEREAS, the Cement Gun Co., Inc., is a New York corporation, with an authorized capital stock of $500,000., consisting of $400,000 of Common Stock and $100,000 of Preferred Stock, full paid, issued and outstanding, with the exception of $25,000. of Preferred Stock, and having equal voting rights; and

WHEREAS, said Cement Gun Co., Inc., hold an exclusive license to manufacture, sell and deal in Cement Guns under the terms of a license issued to it by the General Cement Products Company, owner of the United States Letters Patent, (Los Angeles, Cincinnati and Hawaiian Islands excepted) whereby a royalty of Eleven per cent. (11%) upon the selling price is reserved to said General Cement Products Company; and

WHEREAS, a similar contract is being negotiated with the owners of the Canadian patents on the basis of a Ten per cent. (10%) royalty; and

WHEREAS, said Cement Gun Co., Inc., is a going concern with cash, bills and accounts receivable materially in excess of its bills and accounts payable, other than such as are owing to said Baldwins, to whom there is owing notes to the amount of $20,000, with interest from August, 1914, and $4,688.33 on open account, and with an inventory of Cement Guns, Compressors and accessories of the reasonable value of more than $15,000; and

WHEREAS, said Baldwins desire to secure the benefit of the experience of said Traylor in the management of said Company, and said Traylor desires to secure an option to purchase a controlling interest in said corporation, which said Baldwins are willing to grant, chiefly for the benefit which they deem will accrue to the remaining stock which they hold.

Now, THEREFORE, in consideration of the premises and the sum of One Dollar, by each to the other in hand paid, receipt of which is hereby acknowledged, the parties hereto have mutually covenanted and agreed as follows:

1. Said Baldwins own or control a majority of the capital stock of the Cement Gun Co., Inc.

2. The management of said Company shall forthwith be turned over to said Traylor, who may select a majority of the Board of Directors. Samuel W. Traylor shall be elected President, and a Secretary and Treasurer to be selected by him.

3. Said Traylor will pay to said Baldwins forthwith the sum of $10,000., for which he shall receive on January 1st, 1917, $10,000. of the Preferred Stock of said Company from said Baldwins, and if on or before said first day of January, 1917, said Traylor shall pay to said Baldwins the further sum of

$15,000., they shall deliver to him $15,000. additional .Preferred Stock and $70,000. of Common Stock of said Company. If said Traylor shall pay to said Baldwins the further sum of $13,666. with interest at 5% per annum from January 1st, 1917, on or before the first day of November, 1917, he shall receive from them therefor $13,666. of Preferred Stock and $39,000 of Common Stock of said Company; and if said Traylor shall pay to said Baldwins the further sum of $13,667 with interest at 5% per annum from January 1st, 1917, on or before the first day of September, 1918, he shall receive from them therefor $13,667. of Preferred Stock and $40,000. of Common Stock of said Company; and if said Traylor shall pay to said Baldwins the further sum of $13,667. with interest at 5% per annum from January 1st, 1917, on or before the first day of July, 1918 [sic], he shall receive from them therefor $13,667. of Preferred Stock and $40,000. of Common Stock of said Company.

4. If said Traylor shall fail to exercise any option above set forth and to make payment of the amount provided on any day above set forth, his right to make that and any subsequent payments and secure stock as above set forth shall then cease and determine.

5. So long as said option remains open to said Traylor he shall be entitled to name a majority of the Board of Directors and to dictate the policy of the Company.

6. While said Traylor is so in control of the Company he will loan to the Company such moneys, if any, as may be necessary to pay all its debts, which shall be repaid to him before any dividends are declared or paid by the Company, but not to pay the indebtedness to said Baldwins.

7. In case said Traylor does not intend to make any payment after the first hereinbefore specified he will so notify said Baldwins of his election at least ten days before the day on which any such payment is to be made, and will thereupon turn over to said Baldwins the resignations of the Directors of the Company theretofore nominated by him and be entitled to receive from the Company and will accept its notes at one year for any moneys due him for moneys advanced to it in accordance herewith, with interest at the rate of 5% per annum.

8. Leonard D. Baldwin and Robert L. McElroy, Directors of the Company, shall remain and be entitled to re-election as Directors of the Company from time to time, and as such to have at any time during business hours access to the books, records and correspondence of the Company, and full information of its doings from its officers and employees.

9. Said Traylor will in all reasonable ways promote the interests of the Company for the benefit of himself and the other stockholders.

10. If said Traylor shall make payment of $15,000. above specified on January 1, 1917, said Baldwins will purchase from the Treasury of the Company, at par, $25,000. of the Preferred Stock of the Company, the proceeds to be applied upon account of its indebtedness to them; the remainder of such indebtedness, if any, to be paid to them before any dividends are declared.

11. It is understood and agreed that said Baldwins will loan to said Company any reasonable assistance or advice, and said Leonard D. Baldwin will co-operate in the management of the Company to any reasonable extent desired by Mr. Traylor.

12. The corporation will not at any time pay any salaries, except to officers actually engaged in the Company's business.

13. Samuel W. Traylor may act herein individually or for the benefit of such corporation as he may select, controlled by him, but this contract shall not be otherwise assignable.

14. This contract is made on the basis that the holders of all Preferred Stock shall waive all dividends that may have accumulated prior to January 1st, 1917.

IN WITNESS WHEREOF, the respective parties hereto have hereunto set their hands and seals this 15th day of April, 1916.

LEONARD D. BALDWIN     (L. S.)

ARTHUR J. BALDWIN

by L. D. BALDWIN,

*Atty. in fact.*     (L. S.)

SAMUEL W. TRAYLOR     (L. S.)

Witness:

    H. G. FARLEY.

As to S. W. T.

    G. WALTER SMITH.

Attached to this agreement is an assignment as follows:

In consideration of the sum of One Dollar ($1.00), the receipt whereof is hereby acknowledged, I hereby assign all my right, title and interest in and to the within agreement to the Traylor Engineering & Manufacturing Company. However, should the said Traylor Engineering & Manufacturing Company decide not to exercise its option January 1, 1917, as provided in the within agreement it is understood and agreed that the said Traylor Engineering & Mfg. Company will give me such reasonable notice, not less than thirty (30) days, as may be necessary in order that I may arrange to take over the contract personally, if I so desire.

June 20, 1916.

S. W. TRAYLOR

The Traylor Engineering & Manufacturing Company hereby agrees to the above terms.

TRAYLOR ENGINEERING & MFG. COMPANY

By W. J. ROBERTS *Vice-President.*

ATTEST:

    F. N. CRISPEN

        *Secretary.*

The respondent determined the value of each share of the petitioner's stock to be the amount obtained by dividing the total consideration involved in this contract by the number of shares, both common and preferred, contracted for. He then determined that the value of the license agreement was the amount obtained by multiplying the number of shares issued pursuant to the resolution of the board of directors above set forth by the value per share thus determined.

The stock was transferred in accordance with this contract. The checks in payment for the stock were issued to L. D. and A. J. Baldwin. Executives of the Traylor Engineering & Manufacturing Co. served as officials of the petitioner without compensation. Samuel W. Traylor acted as president of the petitioner at a salary of about $50 or $75 a month. The companies manufacturing cement guns for the petitioner were eliminated as soon as possible after the making of the above contract and the Traylor Engineering & Manufacturing Co. manufactured the cement guns for the petitioner at lower prices

than could have obtained from others. Since the management was taken over by the Traylor Engineering & Manufacturing Co., there has been a noticeable improvement in the financial affairs of the petitioner, and debts which had been accumulated by the petitioner were paid. The Traylor Engineering & Manufacturing Co. assisted the petitioner from time to time with loans.

In its return of income tax for 1919, the petitioner stated the value of its capital stock, determined as of December 31, 1918, as $31,504.42 In its return for 1920 it stated the value of its capital stock, determined as of July 31, 1920, as $100,000.

The balance sheets of the petitioner as of December 31, of each of the years 1918, 1919, and 1920, are as follows:

|  | Dec. 31, 1918 | Dec. 31, 1919 | Dec. 31, 1920 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash at bank and on hand | $6, 021. 36 | $2, 434. 13 | $24, 233. 63 |
| Trade accounts and notes receivable | 37, 957. 32 | 71, 722. 53 | 99, 359. 25 |
| Inventories | 28, 273. 04 | 40, 762. 16 | 45, 685. 56 |
| Investments— | | | |
| Stock—Domestic corporations | 1, 277. 50 | 1, 277. 50 | 1, 277. 50 |
| Deferred charges to future operations | 248. 50 | 5, 880. 86 | 172. 42 |
| Fixed assets, patterns, shop, rental and office equipment, less reserve for depreciation | 9, 445. 14 | 6, 237. 08 | 4, 728. 24 |
| Patents—trade-marks, etc | 470, 245. 51 | 468, 986. 10 | 439, 051. 93 |
| Total | 553, 468. 37 | 597, 300. 36 | 614, 508. 53 |
| **LIABILITIES** | | | |
| Trade accounts and notes payable | 11, 384. 55 | 45, 513. 36 | 38, 216. 07 |
| Accrued expenses and reserves | 13, 055. 87 | 16, 160. 11 | 22, 860. 13 |
| Capital stock outstanding—Common stock | 500, 000. 00 | 500, 000. 00 | 500, 000. 00 |
| Surplus and undivided profits | 29, 027. 95 | 35, 626. 89 | 53, 432. 33 |
| Total | 553, 468. 37 | 597, 300. 36 | 614, 508. 53 |

The petitioner's return of income tax for 1916 shows a net income of $201.37. Its return for 1917 shows a deficit from operations of $6,936.43.

All contracting work under these patents is done by the Cement Gun Contracting Co., which is closely connected with the petitioner. This is a prosperous company, whose income is due entirely to the use of the cement gun and the cement-gun process, the right to which was granted to it by the petitioner.

The General Cement Products Co. has been dissolved. Papers for voluntary dissolution were filed in the office of Secretary of State of the State of New York, June 29, 1917.

By 1914, the process and the apparatus covered by these patents had passed the experimental stage. They were fully developed and in use all over the world, and there have been no substantial changes mechanically since that time. They were in successful operation on a commercial scale. The cement gun was on the market on a com-

mercial basis in 1910 or 1911. The United States Government purchased some guns in 1910, 1911, and 1912.

There have been a few minor changes or additions to the apparatus in the nature of improvements on the apparatus. Patents have been obtained for these improvements—one in 1919, one in 1921, one in 1923, and one in 1925. Royalties are paid, on one of 5 cents each, on another of 50 cents each, and on another of $1 each. These patents relate solely to the machine.

There have been no improvements on the process.

Three or four kinds of machines have been developed which can utilize the process known as the cement-gun process.

OPINION.

STERNHAGEN: The petitioner seeks to establish its right to a deduction under section 234 (a) (7), Revenue Act of 1918,[1] for the exhaustion during 1919 and 1920 of the contract rights acquired in 1914 to use and manufacture under the cement-gun apparatus and process patents. To secure such an allowance it is essential, since they were not acquired by gift or prior to March 1, 1913, for petitioner to establish the cost of such rights when acquired, for it is only its investment which may be recovered by taking such allowance out of its annual income. *United States* v. *Ludey*, 274 U. S. 295; *Union Metal Manufacturing Co.*, 1 B. T. A. 395. The petitioner claims that such cost is to be taken as $450,000, represented by so much of the par value of the $440,000 of stock and of $30,000 of cash and notes as remained after applying $20,000 to the assets of the New York Cement Gun Co. In other words, it is said in effect that the New York Company's assets were worth $20,000; that this amount was intended to be, and was, paid in cash and notes; and that the stock was regarded as fully paid at par and was issued, together with $10,000, in exchange for the licenses in question.

The respondent traverses the basis for computing any exhaustion allowance on two grounds—first, that in the circumstances of the acquisition there was no cost, and, second, if there was in fact a cost, such as the issuance of stock, such cost is not determinable from the evidence. In support of his first ground, respondent refers to the fact, as shown, that petitioner acquired the licenses by the contract of January 1, 1914, directly from the General Cement Products Co. in consideration, not of a capital outlay of cash or an

---

[1] SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

issuance of stock, but of its promise to pay a royalty. In view of this, the later offer of Baldwin and the issuance of stock seem rather incredible. It is not reasonable to suppose that petitioner received the licenses on January 1 to run for the duration of the patents, began actually to operate under such licenses, and thereafter in August received and accepted an offer from Baldwin (its own counsel) to procure the very licenses it already had, together with the assets of the New York Company, for $10,000 in cash, $20,000 in notes, and $440,000 par value of its stock. Somewhere there is an explanation of this apparent inconsistency. But the discrepancy is not mended by the evidence. Both contracts are introduced by petitioner, and both are testified to as effective. For the petitioner to establish the cost claimed it would have to show that the licenses were acquired for the first time as a result of the Baldwin offer and to completely explain away the earlier contract and user. This it has not done; and however strange on its face the situation may appear, there is no room for a judicial surmise in substitution for the evidentiary fact. We find the contract rights or licenses were acquired without capital cost and that there is therefore no basis for an allowance for exhaustion. It may be assumed that the payment of the percentage royalties annually reduces income.

The decision on this point makes it unnecessary to determine the value of the rights in August, 1914, in order to determine the value of the stock alleged to have been issued in payment therefor, and hence unnecessary to consider what weight to give to the opinions of two of petitioner's witnesses, one of whom, not being with the company until 1916, said the New York Company's assets were worth, in 1914, "between $10,000 and $20,000," and the licenses about $450,000, and the other, a promoter of patents, thought they were worth a million. And it is also unnecessary to decide whether the period of exhaustion, if allowable, would be, by reason of the terms of the contract, confined to the duration of the original patents.

The respondent, for 1919, disallowed all exhaustion because not originally claimed. This reason was abandoned before trial, presumably in conformance with *Union Metal Manufacturing Co.*, 1 B. T. A. 395, and the defense placed on the ground above stated. For 1920 an allowance was recognized, but by amended answer this was pleaded as error and respondent moved to increase the deficiency under the authority conferred by section 274 (e), Revenue Act of 1926.[1] Consistently with our finding that the rights

---

[1] Sec. 274. (e) The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any penalty, additional amount or addition to the tax should be assessed, if claim therefor is asserted by the Commissioner at or before the hearing or a rehearing.

were acquired by the contract of January 1, 1914, the motion must be granted and the deficiency increased accordingly.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN did not participate.